# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 06-23048-CV-MOORE

**ELI LILLY AND COMPANY,**
**individually, and f/u/b/o ELGO**
**INSURANCE COMPANY, LTD.,**
**individually, and f/u/b/o CERTAIN**
**LONDON MARKET REINSURANCE,**

      Plaintiffs,

vs.

**AIR EXPRESS INTERNATIONAL**
**USA, INC. d/b/a DANZAS AIR &**
**OCEAN and d/b/a DHL GLOBAL**
**FORWARDING and LUFTHANSA**
**CARGO AG,**

      Defendants.

_____/

## OMNIBUS ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT DHL'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT LUFTHANSA'S MOTION FOR SUMMARY JUDGMENT; DENYING MOTIONS TO STRIKE

THIS CAUSE came before the Court on Plaintiffs' Motion for Summary Judgment (dkt #

93), Defendant Air Express International USA, Inc. d/b/a Danzas Air & Ocean and d/b/a DHL

Global Forwarding's Motion for Summary Judgment (dkt # 88); and Lufthansa Cargo AG's

Motion for Summary Judgment (dkt # 92).

UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being

otherwise fully advised in the premises, the Court enters the following Order.

## I.   FACTS

This case involves the spoilation of a shipment of temperature sensitive insulin products

en route from Fegersheim, France to Indianapolis, Indiana.  Plaintiffs assert three claims in their

Complaint: (1) breach of a Service Agreement between Defendant Air Express International

USA, Inc., d/b/a Danzas Air & Ocean and d/b/a DHL Global Forwarding ("DHL"), and Plaintiff

Eli Lilly and Company ("Lilly"); (2) breach of air waybills by DHL; and (3) breach of air

waybills by Defendant Lufthansa Cargo AG ("Lufthansa").

Lilly is a pharmaceuticals company.  Lilly was the consignee of the spoiled cargo that is

the subject of this case.  Plaintiff Elgo Insurance Company ("Elgo"), a wholly-owned subsidiary

of Lilly, provides "fronting insurance" for Lilly and its subsidiaries and assists Lilly in obtaining

greater coverage through the reinsurance market.  Plaintiff Certain London Market Reinsurance

Underwriters ("London Reinsurers") provided reinsurance coverage for Lilly and its subsidiaries.

Eli Lilly France, S.A. ("Lilly France") is an affiliate of Lilly.  Lilly France contributed to

the manufacturing of the temperature-sensitive pharmaceuticals that are the subject of this

lawsuit.  The pharmaceuticals contained in the shipments in question were initially manufactured

in the United States and the United Kingdom and then shipped to Lilly France for further

manufacturing and finishing.  Lilly France manufactures pharmaceuticals at its plant in

Fegersheim, France (the "Fegersheim plant").

DHL is a provider of logistics solutions, worldwide air and ocean freight, global project

forwarding, and European overland transport.  Pursuant to a Service Agreement between DHL

and Lilly commencing January 1, 2003 (the "Service Agreement"), DHL was to provide

logistical services to Lilly, "including air and ocean freight services, warehousing and

distribution, ground transportation, traditional freight forwarding, customs brokering and clearance, and logistics management." (Service Agreement, at 3.)   The Service Agreement expired under its own terms on December 31, 2007.  (Id. at 10.)

Lufthansa was Lilly France's preferred carrier for shipments of pharmaceuticals from the Fegersheim plant to the United States.  Since at least 2002, Lilly France instructed DHL to arrange bookings with Lufthansa for six to eight containers to be shipped per week.  These six to eight containers booked for weekly shipment are known as Lilly France's "allotment" shipments. Shipments of containers over Lilly France's allotment shipments (i.e., shipments in excess of weekly allotment shipments), are referred to as "supplemental" shipments.

Lufthansa offers a shipping service called "Cool/td."  Under Cool/td, Lufthansa, via DHL, provides Lilly France with LD9 "cooltainers" in which to ship its pharmaceuticals.  These LD9 containers are insulated containers designed to keep cargo cool during transit. They are not designed to protect cargo from exposure to freezing temperatures.  As part of the Cool/td program, the LD9 containers were to be stored at an ambient temperature between 12°C-28°C during transport from the Fegersheim plant to Lilly's plant in Indianapolis.  The shipments that are the subject of this lawsuit were shipped pursuant to Lufthansa's Cool/td program. Lilly France placed temperature recording devices known as "TempTales" inside and outside the LD9 containers in order to monitor the air temperature that the container and cargo would be exposed to in transit.  Sensitech, the manufacturer of the TempTales, provided Lilly France with certificates attesting to the accuracy of the TempTales within one half of a degree Celsius.

Under the Cool/td shipping service, if there were at least three containers in each shipment, Lufthansa would provide the trucking from the Fegersheim plant to the designated

airport. Lufthansa would provide the airport storage of the LD9 containers, loading of the containers onto airplanes, air transport from the designated airport to Chicago's O'Hare airport, and the trucking service from O'Hare airport to Lilly's pharmaceutical facility in Indianapolis.

At the time the shipments in question occurred, Lufthansa, in conjunction with Lilly and DHL, was drafting a Standard Operating Procedures manual. The Standard Operating Procedures manual was to break down each function in the transportation cycle and assign responsibility to the three parties for each function in the cycle. There was no finished draft at the time the shipments in question occurred.

At the time the shipments in question occurred, Frankfurt, Germany was the regular airport for the allotment shipments from the Fegersheim plant to Lilly's plant in Indianapolis.[1] When there was availability, DHL would also arrange for the supplemental shipments to go through Frankfurt. If Frankfurt was unavailable, Lufthansa would suggest alternative routes for shipping the supplemental containers. Lilly France's logistics team would give the final approval regarding utilization of the alternative route suggested by Lufthansa. DHL would then arrange these alternative routes. One of Lufthansa's suggested alternative routes that Lilly France occasionally utilized was through the Munich, Germany airport. Approximately 8 of 440 shipments in the two years prior to the shipments in question went through Munich. All supplemental shipments were still subject to Lufthansa's Cool/td program.

On December 1, 2004, Lilly France requested that DHL arrange a supplemental shipment to Indianapolis of eight LD9 containers of cold-sensitive pharmaceuticals (insulin and growth

---

[1] The draft Standard Operation Procedures manual, dated March 2004, indicated that shipments were to go through the Frankfurt, Germany airport.

4

hormone) for December 20 and December 21, 2004. The eight containers were broken down into

two shipments of four containers each.  Consistent with prior procedure, DHL contacted

Lufthansa's booking agent. Lufthansa proposed routing the supplemental shipments through

Munich due to a lack of capacity out of Frankfurt. DHL's "implant" at the Fegersheim plant - i.e.,

DHL's dedicated customer service representative at the plant - advised Lilly France of

Lufthansa's proposal and Lilly France approved it.

DHL issued two house air waybills between Lilly and DHL for the subject shipments.

DHL also issued two master air waybills between DHL and Lufthansa for the subject shipments.

All of the waybills contained instructions to keep the cargo "REFRIGERATED AT +8

DEGREES CELSIUS" and to "AVOID FREEZING."  All of the air waybills contained a box

titled "Declared Value for Carriage."  All of the air waybills for the shipments in question were

marked "NVD" - "No Value Declared."  The master air waybills state, in the box titled "Nature

and Quantity of Goods," "CONSOLIDATED SHIPMENT PER ATTACHED MANIFEST."

DHL's implant at the Fegersheim plant was responsible for filling out the waybills. Hartmut

Flessa, Lufthansa's Director of Handling Competence, testified at his deposition that the

inclusion of the word "consolidated" on the master air waybill would have led the cargo handlers

at Munich airport to assume that the shipments in question were of low value and required no

special temperature-sensitive handling.

The subject shipments were picked up at the Fegersheim plant by heated trucks hired by

Lufthansa, weighed at the Strasbourg, France airport, and transported by heated trucks hired by

Lufthansa to the Munich airport.  At the Munich airport, the subject shipments were left outside

in freezing temperatures prior to being loaded in the airplane and shipped to Chicago.

After the supplemental shipments arrived in Indianapolis, the TempTales inside and outside the LD9 containers indicated that seven of the eight containers had been subjected to sub-freezing temperatures in violation of the Cool/td shipping protocols. The normal practice of Lilly is to release the cargo for sale if the TempTales demonstrate no impermissible temperature deviation during shipment. Defendants contend that for one of the seven containers, only one of the five TempTales in the container registered sub-freezing temperatures. Defendants contest the accuracy of the TempTales' temperature measurements for all seven containers.

Lilly France issued notices of claim to DHL on December 23 and 24, 2004, for damage to the subject shipments. DHL then issued notices of claim to Lufthansa on December 24, 2004.

Article 3 of the Service Agreement, Performance Metrics, provides:

Exception Reporting: An "Exception Report" will be completed by the Supplier for each incident. . . . A root cause analysis will be performed. Responsibility will be assigned. Immediate action is to be documented. A corrective plan will be documented and discussed with Lilly affiliate[.] The exception report will [be] signed by Lilly and Supplier.

Graphs and data of the TempTales' temperature measurements were emailed to the Fegersheim plant. Lilly France and DHL's representatives then met pursuant to Article 3 of the Service Agreement to complete an Exception Report. The Exceptions Reports, dated December 24, 2004, both stated in relevant part: "Two cooltainers are frozen, because [Lufthansa] did not respect Cool/td procedures." (Scheer Deposition, at Exs. 5-A and 5-B.)

In a letter dated January 3, 2008, J. Florian Pfaff, Lufthansa Cargo Vice-President Global Key Account Management, wrote to Renee Scheer apologizing for spoilation of the shipment. Pfaff wrote: "The shipment was forwarded to Munich and unfortunately there the cool containers were left outside the terminal due to human error. In order not to run into such a situation again I

6

have advised our office in SXB to book and accept only routings via Frankfurt with immediate effect." (See Scheer Deposition, at Ex. 7.) On January 13, 2005, Monica Houck, a Lufthansa Cargo Pharmaceuticals Global Industry Manager, wrote an email of apology to Lilly. Therein, Houck stated that the reason for the spoilation was "human error." (See id., at Ex. 6.) She further stated that one of Lufthansa's action items was that "[Munich airport] is closed for cool/td until further notice since beginning of january." (See id.)

Two weeks after the shipments arrived in Indianapolis, Lilly destroyed the insulin products shipped in the seven containers which registered sub-freezing temperatures on their TempTales.[2] Some of the growth hormone was salvaged. A DHL representative sent an email to Lilly's insurance company representatives requesting that the spoiled cargo not be destroyed. Lilly contends that in order to properly test the insulin products to ensure that they were still viable, Lilly would have had to subject the insulin products to destructive testing. Lilly let the insurance underwriters and DHL representatives examine the spoiled shipment but did not allow them to take the product away from its facility.

Article 5 of the Service Agreement, Indemnification, provides in a subsection titled "Liability Limitations":

> Except for a party's obligations of this Agreement, any damages either party is required to pay for any reason whatsoever and regardless of the form of action, in the aggregate, shall be limited to two times the amount of the total fees payable to Supplier hereunder. Neither Supplier nor Lilly shall be liable for any special, punitive or consequential damages, or loss of profits arising out of or in connection with the respective obligations under this Agreement.

Lilly made a claim to its insurance company Elgo in the amount of $10,251,432.50, which

---

[2]     Defendants contest whether Lilly actually destroyed the insulin products because Lilly did not issues Certificates of Destruction pursuant to their normal procedures.

included the transfer price of the damaged cargo, freight costs, and salvage expenses. Elgo, in turn, made a claim to its reinsurers. The insurer/reinsurers paid a total of $9,000,000 on the claim.

## II.    STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Id. However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.   ANALYSIS

### A.  Plaintiffs' Claims are Governed by the Montreal Convention

#### 1. Plaintiffs' state law claims are preempted

The Montreal Convention entered into force on November 4, 2003.  Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, ICAO Doc. 9740, reprinted in S. TREATY DOC. NO. 106-45, 1999 WL 33292734 (2000).  It succeeded the Warsaw Convention as the treaty exclusively governing the rights and liabilities of passengers and carriers in international air transportation.  Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), ("Warsaw Convention").  "The new treaty unifies and replaces the system of liability that derives from the Warsaw Convention, explicitly recognizing the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution."  Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co., 522 F.3d 776, 780-81 (7th Cir. 2008).  The convention applies to all actions for damages to cargo shipped between member states. Montreal Convention, Art. 29.  The United States, France, and Germany have signed and ratified the Montreal Convention.[3]

Article 24(1) of the Warsaw Convention provides: "In the cases covered by Articles 18 and 19 [which include the provision governing damage to cargo] any action for damages,

---

[3]      The United States Senate ratified the Montreal Convention on July 31, 2003.  The Montreal Convention became effective for the Fourteen European Contracting States of the International Civil Aviation Organization (ICAO), including France and Germany, on June 28, 2004. ICAO PIO 05/04.

however founded, can only be brought subject to the conditions and limits set out in this
Convention." Courts construe Article 24(1) as preempting all state law claims falling within the
scope of the Warsaw Convention. See Fishman by Fishman v. Delta Air Lines, 132 F.3d 138,
141 (2d Cir. 1998). Article 29 of the Montreal Convention, in turn, states: "In the carriage of . . .
cargo, any action for damages, however founded, whether under this Convention or in contract or
in tort or otherwise, can only be brought subject to the conditions and such limits of liability as
are set out in this Convention." Courts have construed Article 29 of the Montreal Convention as
similarly preempting state law actions falling within its scope. See Paradis v. Ghana Airways
Ltd., 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004) ("Article 29 of the Montreal Convention simply
clarified the language of the Montreal Protocol's amendment to Article 24(1) of the Warsaw
Convention.").

Plaintiffs' state law causes of action for breach of contract fall within the scope of the
Montreal Convention. Article 18(1) of the Montreal Convention provides that: "The carrier is
liable for damage sustained in the event of the destruction or loss of or damage to, cargo upon
condition only that the event which caused the damage so sustained took place during the
carriage by air." Pursuant to Article 18(3), "carriage by air. . . comprises the period during which
the cargo is in the charge of the carrier." It is undisputed by the parties that any damage to the
cargo in this case occurred while the containers were in the charge of Lufthansa. Accordingly,
Plaintiffs' breach of contract claims is preempted, and Plaintiffs may only recover against
Defendants subject to the conditions and limits of liability as set forth in the Convention.[4] To

---

[4]     Plaintiffs attempt to circumvent applicability of the Convention by arguing that "[t]he act
of routing the cargo through Munich caused and/or contributed to the damage and therefore may take the
claims outside of the Montreal Convention." (dkt # 122, at 2.) This argument is without merit. First, it

avoid further unnecessary motion practice, the Court will construe Claims Two and Three as

being plead under the Montreal Convention.  Count One is dismissed.

> ### 2. DHL and Lufthansa are subject to liability as contracting and actual carriers, respectively

Article 39 of the Montreal Convention provides:

> The provisions of this Chapter apply when a person (hereinafter referred to as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual carrier") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage, but is not with respect to such part a successive carrier within the meaning of this Convention. Such authority shall be presumed in the absence of proof to the contrary.

Article 40, respective liability of contracting and actual carriers, provides in turn:

> If an actual carrier performs the whole or part of carriage which, according to the contract referred to in Article 39, is governed by this Convention, both the contracting carrier and the actual carrier shall, except as otherwise provided in this Chapter, be subject to the rules of this Convention, the former for the whole of the carriage contemplated in the contract, the latter solely for the carriage which it performs.

> Accordingly, DHL is subject to liability as a contracting carrier.  Lufthansa is subject to

liability as an actual carrier.

> ### 3. Lilly provided timely notice of its claim

Article 31 of the Convention governs the timely notice of claims:

---

is undisputed that the damage occurred at the Munich airport when the containers were in the charge of Lufthansa and thus Plaintiffs' claims fall within the plain language of Article 18(1) and (3). Second, Plaintiffs' suggested interpretation of Article 18(1) would totally circumvent the intended purpose of the Montreal Convention to create a uniform and predicable system of liability for commercial parties engaged in international air transport. Under Plaintiffs' argument, a plaintiff could push back the "cause" of the damage prior to the time of air carriage simply by alleging some anterior superseding event.

(2) In the case of damage, the person entitled to delivery must complain to the carrier forthwith after the discovery of the damage, and, at the latest, within seven days from the date of receipt in the case of checked baggage and fourteen days from the date of receipt in the case of cargo. In the case of delay, the complaint must be made at the latest within twenty-one days from the date on which the baggage or cargo have been placed at his or her disposal.

(3) Every complaint must be made in writing and given or dispatched within the times aforesaid.

(4) If no complaint is made within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on its part.

Defendants attempt to argue that Plaintiffs' claims are precluded because Lilly France, not Lilly filed the notice of claim. Defendants also argue that Plaintiffs' claims are precluded because the notice filed by Lilly France was "contingent and preliminary" in nature. Both arguments are without merit.

The purpose of the requirement of written notice is to adequately inform the carrier of the nature of damages claimed against it. See Highlands Insurance Co. v. Trinidad & Tobago (BWIA International) Airways Corp., 739 F.2d 536, 540 (11th Cir. 1984). As stated by the court in Pesquera Navimar, S.A. v. Ecuatoriana de Aviacion, 680 F. Supp. 1526, 1527 (S.D. Fla. 1988), "the purpose of the notice requirement is just that, to give notice." Here, Lilly France's notices to DHL, dated December 23 and 24, 2004, satisfy the notice requirement of Article 31. In both notices, a Lilly France Business Logistics employee wrote to the DHL implant at the Fegersheim plant: "Our branch in the United States just notified us that a change in temperature occurred while the shipment was in transit between Fegersheim and Indianapolis." (dkt # 120-2, at 3, 7.) The notices then list damage amounts for both shipments. The letter concludes, "You are hereby informed that we hold you liable for those losses." (Id. at 4, 8.) On December 24, 2004, DHL

12

forwarded the notices of claim to Lufthansa.  These notices contain a definite claim for damages made by the party entitled to delivery.  The notices were sufficient on behalf of Lilly to put Defendants on notice of damage to the cargo because Lilly France was relaying information provided by Lilly concerning damage to the cargo, which is the functional equivalent of Lilly having provided notice directly.  Moreover, even if construed as notice on behalf of Lilly France, fulfillment of the notice requirement passes to Lilly by virtue of Lilly France's assignment of rights and ratification to Lilly. (See dkt # 120-4.)  As such, both Defendants received adequate notice of the damage within fourteen days from Lilly's receipt of the shipments.

      4. Standing

Article 14 of the Convention provides that both consignors and consignees can enforce their rights under the contract of carriage: "The consignor and the consignee can respectively enforce all the rights given to them by Articles 12 and 13, each in its own name, whether it is acting in its own interest or in the interest of another, provided that it carries out the obligations imposed by the contract of carriage."  Article 13 provides that the consignee, absent an exercise of the consignor's conflicting rights, has the right to delivery of the shipment.  A consignee may sue both the contractual and actual carrier for any damages that occurred during shipping.  See Convention, at Art. 45 ("In relation to the carriage performed by the actual carrier, an action for damages may be brought, at the option of the plaintiff, against that carrier or the contracting carrier, or against both together or separately.").  Accordingly, Plaintiffs have standing to sue Defendants under the Convention.

Additionally, Lilly France has assigned all of its rights pursuant to the shipments to Plaintiffs in the instant case and has ratified this action.  (See dkt # 120-4.)  Fed. R. Civ. P. 17(a) provides in

relevant part:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

"The function of this ratification rule 'is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.'" Arabian American Oil Co. v. Scarfone, 939 F.2d 1472, 1477 (11th Cir. 1991) (citing Fed.R.Civ.P. 17(a), notes of advisory committee on 1966 amendment). The Court finds that, even if Plaintiffs lacked standing to bring this suit pursuant to Articles 14 and 45 of the Convention, Lilly France's assignment and ratification is valid under Fed. R. Civ. P. 17(a) and resolves any remaining doubts as to Plaintiffs' standing. Under these circumstances, any ratification prior to final judgment is effective because it furthers Rule 17(a)'s purpose of protecting Defendants against subsequent litigation, ensures that the final judgment will have its proper res judicata effect, and works no prejudice upon Defendants.

B. Defendants are Liable under the Montreal Convention

Montreal Convention, Article 18, provides that: "The carrier is liable for damage sustained in the event of the destruction or loss of or damage to, cargo upon condition only that the event which caused the damage so sustained took place during the carriage by air." A prima facie case of carrier liability under the Montreal Convention is established upon a showing that the goods were delivered to the carrier in good condition, were delivered to the consignee at destination in damaged condition, and resulted in a specified amount of damage. Wea Farms v. American Airlines, Inc., 2007 WL 1173077, *3 (S.D. Fla., April 18, 2007) (citing Offshore

14

Aviation v. Transcon Lines, Inc., 831 F .2d 1013, 1014 (11th Cir.1987)).

            1. The cargo was delivered to Defendants in good condition

If the shipment at issue is a sealed container, then the carrier has no independent ability to ascertain the contents of the shipment, and the shipper is held to a higher standard of proof. A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1004 (11th Cir. 2003). When a sealed shipment was damaged en route, and, consequently, the question is only the original condition of the shipment, then reliable, substantial circumstantial evidence of condition will suffice to prove a prima facie case. Id. at 1004. On the other hand, when the shipment was lost, destroyed, or damaged to such extent that it is impossible to tell what was contained in the shipment, direct evidence of the original contents and condition of the shipment is required to prove a prima facie case. Id. As explained by the Eleventh Circuit in A.I.G.: "The heightened proof required of shippers for sealed containers turns on whether the carrier can reasonably be expected to determine the nature of the shipment through independent confirmation." Id. at 1006. In other words, "[w]hen original condition of the contents is at issue . . . reliable and substantial circumstantial evidence will suffice, but when the contents themselves are in question . . . direct evidence must be presented. " Id. at 1007.

Here, Plaintiffs need only present circumstantial evidence that the goods were delivered to Defendants in good condition as it is the original condition of the cargo that is at issue, not the contents themselves. Plaintiffs have presented sufficient circumstantial evidence to satisfy their prima facie burden that the cargo was delivered to Defendants in good condition. Renee Scheer, Logistics Manager for Lilly France, submitted an affidavit with extensive documentation of business records attesting to the contents of the containers attached thereto. Specifically, the

15

following business records are attached to the affidavit: (1) packing lists for the subject cargo that are generated by Lilly France when the cargo is placed in the containers that verify that the proper product and quantity were shipped; (2) protocols of manufacture, analysis, and release which certify that proper procedures of manufacture and packaging were followed for the subject cargos and the cargos can be released for export; (3) certificates of analysis that were generated by Lilly France immediately prior to shipment to certify that the cargo meets the required quality standards and are fit for human use; and (4) checklists for the containers that were prepared by warehouse personnel at Lilly France as the subject cargo was being loaded into the containers to confirm that the cargo was, in fact, loaded. (See dkt # 120-6.) Further, Plaintiffs have demonstrated that one of the containers carrying growth hormone and insulin arrived at Indianapolis in good condition, thus providing circumstantial evidence that all of the cargo was delivered to Defendants in good condition and would have arrived at Indianapolis in good condition had the remaining seven containers not been exposed to sub-freezing temperatures. This evidence is sufficient to satisfy Plaintiffs' prima facie burden to demonstrate delivery of the cargo to Defendants in good condition.

   2. The cargo was received in damaged condition

  Plaintiffs have produced evidence demonstrating that they received the cargo in damaged condition. First, Plaintiffs have presented credible evidence, through Lilly France's "deviation reports," that seven of the eight containers were exposed to sub-freezing temperatures. Defendants attempt to establish that not all of the containers were subjected to subfreezing temperatures because one of the containers only recorded temperatures of .1°C below 0°C and therefore this was insufficient to establish that the container was exposed to subfreezing

temperatures.  However, the TempTales have a margin of error of +/- .5°C.  Therefore, the cargo could have been exposed to temperatures ranging from -.6°C to .4°C.  A recorded temperature of -.1°C was sufficient to have put the cargo in a range of unacceptable temperatures.  While Defendants also attempt to attack the accuracy of the TempTales temperature recording devices, Plaintiffs have provided an affidavit from David Ray, Senior Director of Quality Assurance for Sensitech, Inc., supplier of the TempTales.  Mr. Ray states therein that all TempTales were thoroughly tested and certified for accuracy before being provided to Lilly France for use.  Further, the TempTales, when returned to Sensitech (the devices are single-use and must be returned to the supplier for retesting before they can be reused), showed no deficiencies and were subsequently resold.

Second, Plaintiffs have also presented undisputed evidence, through the expert report of William C. Harris, that insulin products that are exposed to sub-freezing temperatures are not suitable for release for public use.  Mr. Harris stated in his report that insulin that has been exposed to sub-freezing temperatures may undergo subtle changes that are not detectable by physical inspection.  In order to adequately test the exposed insulin to determine its integrity, the insulin must be destructively tested.  The necessary conclusion from Mr. Harris' report is that no insulin that has been exposed to freezing temperature may be released for public consumption because the only way to determine the insulin's integrity is through destructive testing which would render the insulin unusable.  That is, once the insulin products have been subjected to sub-freezing temperatures, they become unsaleable, regardless of whether actual damage occurs.[5]

---

[5]      The Defendants argue extensively that Plaintiffs have not established that the cargo was damaged when it was delivered because Defendants were unable to test the insulin products themselves to determine damage and Plaintiffs have failed to produce evidence of actual physical damage to the

17

Even with the Temptales' margin of error of +/-.5°C, the mere possibility that the insulin had been exposed to sub-freezing temperature, combined with the necessity of destructive testing, is sufficient to conclude that the insulin could not safely be released for public consumption.

Third, Plaintiffs point to 21 C.F.R. § 211.208, drug product salvaging, which provides in relevant part:

> Drug products that have been subjected to improper storage conditions including extremes in temperature, humidity, smoke, fumes, pressure, age, or radiation due to natural disasters, fires, accidents, or equipment failures shall not be salvaged and returned to the marketplace.  Whenever there is a question whether drug products have been subjected to these conditions, salvaging operations may be conducted only if there is (a) evidence from laboratory tests and assays (including animal feeding studies where applicable) that the drug products meet all applicable standards of identity, strength, quality, and purity and (b) evidence from inspection of the premises that the drug products and their associated packaging were not subjected to improper storage conditions as a result of the disaster or accident.

As there was evidence affirmatively establishing that the insulin was subjected to improper storage conditions and there was no viable testing that would have conclusively demonstrated the presence of damage while preserving the integrity of the insulin, salvaging the cargo would have been in violation of federal regulations.

Thus, reliable reports that the insulin products were subjected to sub-freezing temperatures, the conclusion that insulin products subjected to sub-freezing temperatures may not be safely released to the public, and the federal regulation prohibiting salvage of pharmaceuticals subjected to improper storage conditions- taken in conjunction, conclusively

_____

insulin products.  Defendants arguments miss the fundamental point regarding the damage to the insulin products: the exposure or likelihood of exposure to sub-freezing temperatures rendered the insulin products unsaleable and thus useless, regardless of whether actual observable damage occurred. Moreover, even given the possibility of testing random samples, the health and safety concern, and corresponding potential liability, surrounding distribution of a pharmaceutical product that may have been improperly exposed to sub-freezing temperatures warranted the destruction of the entire lot.

demonstrate that the cargo was received by Lilly in damaged, unsaleable, and useless condition. Finally, Defendants have offered no explanation, such as fraud, as to why Plaintiffs, having had an ongoing successful shipping relationship with Plaintiffs, would now for the first time falsely claim damage, in the absence of actual damage, of products whose very business it is for Plaintiff to resell for profit.

### 3. Defendants have no defenses under the Montreal Convention

Article 18(2) of the Montreal Convention provides that

the carrier is not liable if and to the extent it proves that the destruction, or loss of, or damage to, the cargo resulted from one or more of the following:

(a) inherent defect, quality or vice of that cargo;

(b) defective packing of that cargo performed by a person other than the carrier or its servants or agents;

(c) an act of war or an armed conflict;

(d) an act of public authority carried out in connection with the entry, exit or transit of the cargo.

Defendants have failed to proffer evidence that any of the four enumerated defenses set forth in Article 18(2) apply in this case.

Article 20 of the Montreal Convention provides Defendants an additional defense for exoneration. Article 20 provides that:

If the carrier proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation, or the person from whom he or she derives his or her rights, the carrier shall be wholly or partly exonerated from its liability to the claimant to the extent that such negligence or wrongful act or omission caused or contributed to the damage.

Lufthansa suggests that Lilly France was negligent in approving the routing of the

19

shipment in violation of the Standard Operating Procedures. The Court rejects this argument. There is no evidence on the record that Lilly France acted negligently. Lilly France agreed to route the shipment through the Munich Airport at the suggestion of Lufthansa. If there was an embargo for temperature-sensitive products at the Munich Airport at the time of the shipments, there is no evidence that Lilly France was aware of it. In fact, the evidence indicates that the embargo was not imposed until January 2005, after the shipments occurred. Further, the shipments in question were to be shipped pursuant to the "Cool/td" program which was specifically designed to prevent against exposure to freezing temperatures. A number of shipments (at least eight) had gone through the Munich Airport in the two years prior to the shipments in question without mishap. Even if Lilly had been aware of an embargo that was in effect, as long as Lufthansa represented that it could transport the cargo through Munich Airport without compromising the cargo, Lilly would not have been negligent. Finally, documents and correspondence exchanged at the time of the incident demonstrate that the damage was the result of human error at the Munich Airport, and not due to any negligence by Lilly France.

Lufthansa also suggests that it should be wholly or partially exonerated because of DHL's allegedly negligent designation of the cargo as "consolidated" on the master air waybill. The "consolidated" designation might be of some significance in a case where a shipper had no knowledge concerning the nature of the cargo and could reasonably infer from the "consolidated" designation that the cargo was of low value and required no special handling. However, given the circumstances here, the "consolidated" designation is insufficient to establish exoneration. The LD9 containers were shipped via Lufthansa's Cool/td shipping service. The purpose of using Cool/td and the "cooltainers" was to regulate the temperature of cargo during shipping.

Lufthansa was aware of Lilly's shipping needs concerning temperature sensitive cargo and was aware that Lilly used to Cool/td shipping service. Therefore, in light of Lufthansa's knowledge concerning the temperature-sensitive handling that Lilly required, Lufthansa could not have reasonably drawn an inference to the contrary based on the "consolidated" designation. Moreover, even in the absence of knowledge concerning the cargo and usage of the Cool/td shipping service, all of the waybills contained instructions to keep the cargo "REFRIGERATED AT +8 DEGREES CELSIUS" and to "AVOID FREEZING." Accordingly, Lufthansa is not entitled to an exoneration defense.

### 4. Damages

The parties do not dispute that if Defendants are found liable, Plaintiffs are entitled to damages. However, the parties dispute the amount of Plaintiffs' damages and the Defendants' limitation of liability for those damages.

#### a. Lufthansa's liability is capped at 17 Special Drawing Rights per kilo

Article 22(3) of the Montreal Convention states:

> In the carriage of cargo, the liability of the carrier in the case of destruction, loss, damage or delay is limited to a sum of 17 Special Drawing Rights[6] per kilogram, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires.

Plaintiffs concede that, under the Montreal Convention, Lufthansa's damages are capped at 17 SDRs per kilo. The parties also concede that Plaintiffs can only recover for the weight of the damaged cargo.

---

[6]     The Special Drawing Right ("SDR") is a fluctuating international reserve asset created by the International Monetary Fund. See http://www.imf.org/external/np/exr/facts/sdr.htm.

> ### b. DHL's liability is capped at two times the total fees payable to DHL under the Service Agreement

Article 25 of the Montreal Convention states that: "A carrier may stipulate that the contract of carriage shall be subject to higher limits of liability than those provided for in this Convention or to no limits of liability whatsoever." The parties did not stipulate in any of the air waybills that the shipments in question would be subject to higher limits of liability than those provided for in the Montreal Convention. However, Lilly argues that Article 5 of the Service Agreement contains a higher limit of liability for DHL than that provided for in the Montreal Convention. Lilly seeks to have the Court apply this higher liability limitation to its damages against DHL.

Article 5 of the Service Agreement between DHL and Lilly provides under "Liability Limitations": "Except for a party's obligations of this Agreement, any damages either party is required to pay for any reason whatsoever and regardless of the form of action, in the aggregate, shall be limited to two times the amount of the total fees payable to Supplier hereunder." This provision does not specify whether the reference to "total fees payable" refers to total fees payable for a particular shipment that is damaged or lost, or to total fees payable for the duration of the Service Agreement.

Plaintiffs and DHL dispute the meaning of this contractual provision. DHL contends that it is illogical to read the provision "two times the amount of the total fees payable to Supplier hereunder" to mean two times the total fees payable to DHL under the entire term of the Service Agreement. DHL argues that if the damages occurred in the first week of the contract, this reading of the provision would require the parties to wait five years (the length of the Service

Agreement) to determine whether the liability limitation applies. DHL contends that a more sensible interpretation would be to read the provision as limiting liability to double the amount of fees for each particular shipment governed by the Service Agreement. DHL estimates that the cost of shipment in this case was less than 3000 euros.

Plaintiffs contend that DHL's interpretation of the liability limitation provision is erroneous because the Montreal Convention prohibits carriers from setting a limitation of liability lower than that provided for in the Montreal Convention (i.e. 17 SDR's per kilogram).[7] Plaintiffs contend that the only reasonable interpretation of the provision is to read the limitation of liability as totaling two times the total amount of fees under the contract. Plaintiffs estimate that Lilly paid DHL $250,000,000 for services over the course of the five year term of the Service Agreement, and that it is not unreasonable for the Parties to wait until the end of the contract to determine the limitation of liability. Additionally, Plaintiffs assert that there would be no reason to wait until the expiration of the contract to determine the liability limitations because the Parties could determine whether the damages in a lawsuit exceeded the amount of fees paid at any time during the course of the contract.

This Court finds that the Liability Limitation clearly and unambiguously establishes that DHL's liability is limited to two times the total fees payable to DHL for the duration of the Service Agreement. Article 5 states that "any damages either party is required to pay for any reason whatsoever and regardless of the form of action, in the aggregate, shall be limited to two times the amount of the total fees payable to Supplier hereunder." The Service Agreement's

---

[7]       Article 26 of the Montreal Convention states that "Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void."

23

reference to "any damages . . . in the aggregate" is an unambiguous reference to total damages recoverable for the duration of the Service Agreement. The Service Agreement's reference to damages "in the aggregate" supports the conclusions that "total fees payable" refers to the aggregate of all fees payable for the duration of the Service Agreement. This is so because the Service Agreement's attempt to limit total damages recoverable for the duration of the contract is followed by language that compares such damages with the total fees payable. The juxtaposition of "aggregate damages" with "total fees payable" indicates that both are made in reference to the duration of the Service Agreement, resulting in temporal parity between damages and fees that facilitates easy comparison. To find otherwise would result in the absurd interpretation that total aggregate damages recoverable for the duration of the contract would be limited to twice the fees associated with any particular shipment that was damaged. Thus, once a loss occurred resulting in damages, the amount of damages paid for that incident would constitute the total aggregate damages recoverable for the life of the Service Agreement. Such an interpretation is both insensible and unsupported by the language of Article 5. Moreover, the use of "hereunder" in Article 5 further supports the conclusion that "total fees payable" refers to total fees payable for the duration of the Service Agreement because "hereunder" refers to the Service Agreement in its entirety.

Finally, under DHL's interpretation, there are circumstances in which a damages limit of twice the shipping cost of a particular shipment would violate the Montreal Convention's minimum damages threshold of 17 SDR's per kilo. In such cases, the above-referenced provision in Article 5 would become surplusage because Article 26 of the Montreal Convention renders null and void any provision that limits damages to less than 17 SDR's per kilo. See Fla.

Polk County v. Prison Health Servs., Inc., 170 F.3d 1431, 1439 (11th Cir. 1999) (stating that the provisions of a contract should be construed to give every provision meaning); Maccaferri Gabions, Inc. v. Dynateria Inc., 91 F.3d 1431, 1439 (11th Cir. 1999) (stating that an interpretation that gives meaning to all parts of a contract is preferable to one which leaves portions meaningless).  Therefore, the damages limit under Article 5 is two times the total fees DHL is entitled to for the duration of the Service Agreement.

Even if the liability limitation provision of Article 5 of the Service Agreement was ambiguous, parol evidence supplied by Lilly would still support the Court's interpretation. "Extrinsic evidence is admissible to explain a latent ambiguity, but is not admissible in the case of a patent ambiguity." Ace Electric Supply Co. v. Terra Nova Electric, Inc., 288 So. 2d 544, 547 (Fla.1st DCA 1973) (internal citations omitted).  Here, if there is any ambiguity as to the liability limitation provision, the ambiguity is latent, as the language is clear and intelligible but the parties disagree as to whether the limitation applies to fees paid to DHL for each shipment or fees paid over the entire course of the contract.  See Johnson Enters. of Jacksonville v. FPL Group, 162 F.3d 1290, 1310 (11th Cir. 1998) ("A latent ambiguity . . . is said to exist where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings.") (quoting Crown Management Corp. v. Goodman, 452 So.2d 49, 52 (Fla. 2d DCA 1984).

David Bernard, the Lilly lawyer that drafted the liability limitation provision in Article 5, testified at his deposition that his intent in drafting the provision was to set the liability limitation at two times the total fees paid by Lilly to DHL over the course of the five-year Service Agreement.  (Bernard Deposition at 25.)  Bernard also testified that the clause was intended to

25

shift risk to DHL over the course of the Service Agreement: "The intent was that as a supplier collects fees that they would also accept greater risk of their activities." (Id. at 26.)

Accordingly, the Court finds that under the plain terms of Article 5, DHL's liability is capped at two times the total amount of fees due under the Service Agreement. Additionally, even if the terms of Article 5 were ambiguous, the record evidence indicates that the Parties' intent was to limit DHL's liability to two times the total amount of fees due. Michael Mabe, Lilly's Department Head of International Transportation and Services, stated in an affidavit that DHL's fees under the Service Agreement have exceeded $250,000,000.[8] (See Mabe Affidavit at 3.) As Plaintiffs are seeking damages in the range of $10,000,000, DHL's liability limitation under the Service Agreement is not triggered here.

### c. Damages calculated based on the transfer price

The traditional measure of damages in a cargo case is the difference between the fair market value of the cargo in good condition at the port of destination, and the fair market value of the cargo in its damaged condition at the port of destination. See Terman Foods, Inc. v. Omega Lines, 707 F.2d 1225 (11th Cir. 1983). The theory is that, generally, merely awarding replacement costs deprives a manufacturer of expected profit which he is on the verge of earning and does not compensate him for what he would have had if the contract had been performed. See Polaroid Corp. v. Schuster's Express, Inc., 484 F.2d 349, 351 (1st Cir. 1973)

In this case, there is nothing on the record to indicate the fair market value of the damaged insulin. Cf. Project Hope v. M/V Ibn Sina, 250 F.3d 67, 77 (2d Cir. 2001) (finding that

---

[8]     While Defendants have moved to strike Mabe's affidavit, they do not challenge his testimony regarding DHL's total fees under the Service Agreement.

there was no open market from which to derive the fair market value of humulin, Lilly's insulin product). However, there is evidence on the record as to the "transfer" price of the damaged insulin, which represents the price at which Lilly could sell the insulin products to the next affiliate or third-party in the supply chain. Lilly urges the Court to follow Terman Foods and award damages based on the transfer price of the insulin products.

Defendants, on the other hand, ask the Court to limit damages to Lilly's manufacturing costs. Defendants point to an exception to the traditional rule of damages in cargo cases set forth in Illinois Cent. R.R. Co. v. Crail, 281 U.S. 57, 64-65 (1930), in which the Supreme Court held that "[the market value measure] may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable." In that case, the plaintiff, a coal dealer, purchased a carload of coal, the shipment of which was delivered with 5,500 pounds less than the agreed upon amount. At the time of delivery, the plaintiff had not resold any of the coal and the shortage did not interfere with the maintenance of his usual stock. He was able to purchase coal of like quality at a wholesale price of $5.50 per ton. The retail market price was $13 per ton. The Supreme Court held that the retail market price was not the appropriate measure of damages because, "in the actual circumstances the cost of replacing the exact shortage at retail price was not the measure of the loss, since it was capable of replacement, and was, in fact, replaced in the course of respondent's business from purchases made in carload lots at wholesale market price without added expense." Id. at 63. Defendants argue that, under Crail, manufacturing costs are the most appropriate measure of damages, because the insulin products that were destroyed were replaced from existing inventory and this inventory was then replaced through Lilly France's normal manufacturing process.

The Court finds that the transfer price is the best measure of damages here.  Marty
Clemens, a manager in tax for Lilly, testified regarding the nature of pricing within Lilly and
amongst its affiliates.  Lilly and its affiliates transact with each other at arm's length.  (Clemens
Deposition, at 17.)  From initial manufacture to final sale, pharmaceuticals within the Lilly
supply chain are subject to a number of inter-affiliate transactions.  For example, one Lilly
affiliate commits resources to research and development for a chemical and manufactures the
chemical in bulk.  (Id. at 29.)  The bulk manufacturer Lilly affiliate then sells the chemical to
another Lilly affiliate for further processing at a price which reflects the bulk manufacturing costs
and costs for research and development and service along with a profit allocation to the bulk
manufacturer Lilly affiliate.  (Id. at 14, 47.)  At the next level, the processing Lilly affiliate
performs further manufacturing for which it incurs costs.  The price to the next Lilly affiliate (the
third in the chain in this example) must account for this cost and the appropriate level of profit
earned by the processing Lilly affiliate.   That is, as the product moves along the supply chain to
the end customer, all costs and profit as to each Lilly affiliate in the supply chain must be
accounted for in the price of the product.

The transfer price represents the price at which a Lilly affiliate in the supply chain, that is
in possession of a product at a certain point in time, sells the product to another Lilly affiliate or a
third-party. The transfer price encompasses all the costs incurred throughout the Lilly supply
chain up to a given point and all the profit that is earned in each step of the supply chain up to
that point.  The "manufacturing costs" that Defendants seek to set as damages fail to account for
all the other costs incurred as the product moves through the supply chain  Awarding damages
based on "manufacturing costs" also fails to account for the profit that the various Lilly affiliates

have already built into the transfer price. Thus, in order to make Lilly whole, it is not simply a matter of purchasing more of a commodity from a wholesaler like a coal dealer. The correct measure of damages is the transfer price which represents the real "economic value" that Lilly lost when the insulin was damaged in transit. (Id. at 30.) Pursuant to Articles 40, 41 and 45 of the Montreal Convention, both DHL and Lufthansa are liable for damages to which Plaintiffs are entitled up to the aforementioned limits as specified in subsection (B)(4) of this Order.

### C.  Plaintiffs Have Not Committed Spoilation of Evidence Warranting an Adverse Inference Instruction or Dismissal of Their Case

Defendants seek sanctions against Plaintiffs for Lilly's destruction of the insulin without physical inspection and without allowing DHL's representatives to examine the insulin. A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed, (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Posely v. Eckerd Corp., 433 F. Supp. 2d 1287, 1315 (S.D. Fla. 2006) (quoting Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004)).

Here, two of the factors militate against imposing any kind of sanctions against Plaintiffs. First, Defendants have not shown that Lilly acted with a "culpable state of mind" in destroying the insulin products. There is no evidence in the record to suggest that Lilly destroyed the insulin products in a bad faith attempt to impede or hinder Defendants' case. Second, as discussed above, Lilly's destruction of the insulin products did not affect Defendants ability to make a

claim or a defense. The exposure to sub-freezing temperatures rendered the insulin products unsaleable and thus useless, regardless of whether actual observable damage occurred. The only way to conclusively determine that damage had not occurred would be to destructively test each vial of insulin. Moreover, despite the possibility of testing random samples within the cargo, the health and safety concern surrounding the possibility that some vials were compromised while others were not warranted destruction of the entire lot. Thus, even if DHL had been allowed access to the insulin products, the insulin would have still been destroyed, irrespective of the results of any testing. Thus, the relief sought by Defendants is inappropriate here.

    D.  Motions to Strike

    The parties have also filed a number of Motions to Strike. Those motions are denied for the reasons stated below.

    1. Motion to Strike Affidavit of Rene Scheer (dkt #'s 145, 150 )

    The Court has only relied on that portion of Scheer's affidavit that sets forth and attaches the business records relating to the shipments in question: i.e., packing lists for the subject cargo generated by Lilly France, protocols of manufacture, analysis, and release; certificates of analysis; and checklists for the containers. (See supra Section II.B.1; dkt # 120-6 at 2-3.) DHL argues that these documents are inadmissible hearsay.

    The business records exception to the hearsay rule, set forth in Fed. R. Evid. 803(6):

> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a

statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The documents attached to Scheer's affidavit fall within the business records exception to the hearsay rule. Scheer is a qualified witness. He is the logistics manager for Lilly France. He is responsible for managing the entire logistics chain for shipments moving in and out of the Fegersheim plant. (See Scheer Deposition at 9.) Therefore, Scheer is qualified to testify concerning the documentation that accompanies shipments of pharmaceuticals from the Fegersheim plant. Additionally, Scheer states in his affidavit that these documents were created and maintained in the ordinary course of business as part of Lilly France's regular business practice for every shipment that leaves their facility. (See dkt # 120-6 at 2.) Finally, the Court disagrees with DHL that the French-language check-lists and Scheer's translation into English are inadmissible. Scheer states in his affidavit that the checklist is a regularly-kept business record and as a French and English speaker, Scheer can offer testimony that the documents are what he purports them to be. As such, the Motion to Strike Scheer's affidavit is DENIED.

> 2. Motion to Strike Affidavits of Michael Mabe (dkt # 114, 117), Motion to Strike Affidavit of Monika Houck (dkt # 146), Motion to Strike Portions of Affidavit J. Florian Pfaff (dkt # 147); Motion to Strike Supplement Affidavit of Rene Scheer (dkt # 158)

The Court has not relied on the challenged portions of these affidavits or the documents attached thereto in making its rulings in this Order. Accordingly, these Motions to Strike are denied.

## IV. CONCLUSION

Based on the foregoing, it is:

ORDERED AND ADJUDGED that Plaintiffs' Motion for Summary Judgment (dkt # 93) is GRANTED IN PART AND DENIED IN PART, consistent with terms of this Order.  It is further

ORDERED AND ADJUDGED that DHL's Motion for Summary Judgment (dkt # 88) is GRANTED IN PART AND DENIED IN PART, consistent with the terms of this Order.  It is further

ORDERED AND ADJUDGED that Lufthansa's Motion for Summary Judgment (dkt # 92) is GRANTED IN PART AND DENIED IN PART, consistent with the terms of this Order. Given that liability has been established, damages is the only remaining issue to be resolved at trial.  It is further

ORDERED AND ADJUDGED that the Parties' Motions to Strike (dkt #'s 114, 117, 146, 147, 158) are DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this _01_ day of March, 2009

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

32